173 N.J. Super. 486 (1980)
414 A.2d 603
SASSO CONTRACTING CO., INC., PLAINTIFF-RESPONDENT,
v.
STATE OF NEW JERSEY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued April 15, 1980.
Decided May 8, 1980.
*487 Before Judges LORA, ANTELL and PRESSLER.
Jerry Fischer, Deputy Attorney General, argued the cause for appellant (John J. Degnan, Attorney General of New Jersey, attorney; Erminie L. Conley, Assistant Attorney General, of counsel).
Theodore W. Geiser argued the cause for respondent (Connell, Foley & Geiser, attorneys; John F. Neary and Thomas S. Cosma on the brief).
The opinion of the court was delivered by ANTELL, J.A.D.
After allowing a credit of $26,827.80 for defects and $1,700 liquidated damages for delayed performance, the Law Division entered judgment in the amount of $118,788.28 in favor of plaintiff and against defendant. The suit arose from a contract for the installation of longitudinal drains along a section of Route 78, and the judgment reflects losses incurred because of inaccuracies in the advertised plans and specifications upon which plaintiff relied in preparing its bid.
*488 The project called for the construction of a drain in the roadway's outer shoulder for a distance of 60,000 linear feet. Plaintiff contends that it based its bid on a cross-sectional drawing of the shoulder accompanying the plans showing an existing layer of asphalt two inches deep. The trial judge found that the asphalt layer was "substantially thicker" than shown in the drawing and that, at least for the first half of the job, was of an average thickness of 3 1/2 inches. It was also found that the drawing constituted an express representation upon which prospective bidders could rely in planning their construction methods and anticipating the cost of equipment necessary to prepare their bids.
The State notes that the drawing does not purport to show the shoulder of the roadway "as built", explains that it was probably prepared before the actual construction of the highway, and was included in the specifications not as a statement of actual subsurface conditions, but only as an aid to prospective bidders in visualizing the various layers of subsurface material. Its position is fortified by those provisions of the specifications which oblige the contractor to ascertain all physical characteristics "above, on and below the surface of the ground."
§ 1.2.11 provides:
1.2.11. Familiarity with Work.
It is the obligation of the Bidder to ascertain for himself all the facts concerning conditions to be found at the location of the Project including all physical characteristics above, on and below the surface of the ground, to fully examine the Plans and read the Specifications, to consider fully these and all other matters which can in any way affect the work under the Contract and to make the necessary investigations relating thereto, and he agrees to this obligation in the signing of the Contract. The State assumes no responsibility whatsoever with respect to ascertaining for the Contractor such facts concerning physical characteristics at the site of the Project. The Contractor agrees that he will make no claim for additional payment or extension of time for completion of the work or any other concession because of any misinterpretation or misunderstanding *489 of the Contract, on his part, or of any failure to fully acquaint himself with all conditions relating to the work.
§ 1.2.12 provides:
1.2.12. Subsurface Conditions.
It is the obligation of the Bidder to make his own investigations of subsurface conditions prior to submitting his Proposal. Borings, test excavations and other subsurface investigations, if any, made by the Engineer prior to the construction of the Project, the records of which may be available to bidders, are made for use as a guide for design. Said borings, test excavations and other subsurface investigations are not warranted to show the actual subsurface conditions. The Contractor agrees that he will make no claims against the State, if in carrying out the Project he finds that the actual conditions encountered do not conform to those indicated by said borings, test excavations and other subsurface investigations.
Any estimate or estimates of quantities shown on the Plans or in the form of proposal, based on said borings, test excavations and other subsurface investigations, are in no way warranted to indicate the true quantities. The Contractor agrees that he will make no claims against the State, if the actual quantity or quantities do not conform to the estimated quantity or quantities, except in accordance with the provisions of Art. 1.8.4.
While we might agree with the trial judge that "general exculpatory clauses" will not relieve the State from responsibility for its express representations, it is otherwise where the relevant language of the contract is so straightforward, unambiguous and categorical as this is in placing responsibility for subsurface investigations on the contractor. Not only do the cited provisions oblige the bidder to acquaint itself fully with all physical characteristics of the job site, they specifically recite that the State has no responsibility with respect thereto, and in explicit terms bar the contractor from seeking redress for losses incurred through its failure to acquaint itself fully with all work conditions. Moreover, the exculpatory provisions focus directly on subsurface conditions and require the bidder to make its own investigations with respect thereto before bidding. They clearly state that "subsurface investigations" performed by the project engineer, although made available to the bidders "as a guide for *490 design," are not warranted to show actual subsurface conditions or quantities, and that the bidder specifically agrees not to claim damages against the State if, in performing the project, conditions and quantities are found which differ from those shown by the subsurface investigations.
Under the terms of this contract, the State's representations are merely gratuitous and if plaintiff chose to rely on this information it acted at its peril. To conclude otherwise would virtually insure the profitability of speculative bidding. If the contractor decides to meet its obligation to investigate by doing nothing more than accepting the State's unverified representations, the State would have to pay compensation should it be disappointed by actual conditions. If conditions turn out to be as represented, then it has been enabled to formulate a profitable bid without incurring the expense of subsurface explorations. And if conditions turn out to be more favorable than represented, there would be an additional profit which is not likely to be returned to the State. Taking this view of the contractor's responsibility, other courts in similar cases have denied governmental liability where actual subsurface conditions fall below the contractor's expectations. J.A. Thompson & Son, Inc. v. State, 51 Haw. 529, 465 P.2d 148, 155 (Sup.Ct. 1970); Weston v. State, 262 N.Y. 46, 186 N.E. 197, 199 (Ct.App. 1933); Foundation Co. v. State, 233 N.Y. 177, 135 N.E. 236, 238 (Ct.App. 1922).
We differentiate the facts before us from those recently considered in Golomore Associates v. N.J. State Highway Auth., 173 N.J. Super. 55 (App.Div. 1980). There, an excavating contractor was allowed recovery for damages sustained by relying upon incorrect data contained in elevations which were included in the advertised plans and specifications. Although the published opinion is uninformative as to the precise language of the contract, it appears that the governmental body defended against this claim on the basis of "general disclaimers" (p. 58) in *491 the contract and not upon the kind of carefully stated assumption of responsibility by the contractor here presented. (The operative distinction between general and specific disclaimers is well recognized. Ace Stone, Inc. v. Wayne Tp., 47 N.J. 431, 436 (1966); Buckley & Co., Inc. v. State, 140 N.J. Super. 289, 299-300 (Law Div. 1975).) But in denying plaintiff's other claim for the cost of removing unanticipated "wet material", the court postulated that even if a representation concerning same had been made, plaintiffs could not "overcome the specific disclaimer in the specifications for any information concerning subsurface conditions." Golomore Associates, supra, 173 N.J. Super. at 59. We therefore regard the Golomore Associates decision as fully compatible with our determination herein.
We also distinguish that line of authority typified by United States v. Spearin, 248 U.S. 132, 136-37, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918); Luria Brothers & Co. v. United States, 369 F.2d 701, 708, 177 Ct.Cl. 676 (Ct.Cl. 1966); J.D. Hedin Constr. Co. v. United States, 347 F.2d 235, 241, 171 Ct.Cl. 70 (Ct.Cl. 1965); and Laburnum Constr. Corp. v. United States, 325 F.2d 451, 457, 163 Ct.Cl. 339 (Ct.Cl. 1963). These generally stand for the proposition that where a governmental body orders construction work to be done, and in so doing prepares the project's specifications, prescribing the character, dimensions and location of the work to be done, it implicitly warrants, nothing else appearing, that if the specifications are complied with, satisfactory performance will result. However, we have not been made aware of any instance in which this rule was applied to allow damages where the faulty information acted on so clearly fell, as here, within the ambit of the contractor's responsibility and outside that of the governmental body's.
Plaintiff cross-appeals from so much of the judgment below that allowed the State a credit of $26,827.80 for defective performance. The faulty condition on which this determination rests consists of a settlement of the trench which apparently occurred. Plaintiff argues, and we agree, that its obligation *492 went no further than to conform with the plans and specifications prescribed by the State as part of the contract. The evidence nowhere demonstrates either that it departed from the specifications or, if so, that it did so without the prior approval of the State's resident engineer. The point has not been answered by the State. The State's principal witness himself testified "I don't know the exact nature of the cause itself", and we conclude that the judgment entered on the counterclaim is not supported by proof of any causal relationship between the condition complained of and default by the plaintiff.
Judgments on complaint and counterclaim reversed in the respects noted.